| | | |
|---|---|---|
| GEORGE LIKAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:03-0314 |
| | ) | JUDGE ECHOLS |
| LIFE INSURANCE COMPANY OF NORTH | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

Presently pending before the Court are the following Motions:
(1) Defendant's Motion for Judgment on the Administrative Record
(Docket Entry No. 62); (2) Plaintiff's Motion for Judgment on the
Administrative Record (Docket Entry No. 82); (3) Defendant's Motion
to Strike, or in the Alternative to Exclude from Consideration,
Plaintiff's Citations to Medical Authorities (Docket Entry No. 87);
and (4) Plaintiff's Second Motion for Discovery (Docket Entry No.
91).

## I. PROCEDURAL HISTORY

On March 4, 2003, Plaintiff George Likas initiated suit in the
Chancery Court for Davidson County against Defendant Life Insurance
Company of North America ("LINA"),[1] alleging a claim for bad faith
breach of health insurance contract. (Exh. A to Docket Entry
No. 1). Defendant filed a notice of removal on April 10, 2003,

_____

[1]Cigna Group Insurance originally was named as Defendant in
this action. Upon removal to this Court, Life Insurance Company of
North America was substituted as the proper Defendant. (Docket
Entry No. 1).

1

asserting that this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1441 as Plaintiff's claim is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq. (Docket Entry No. 1). On May 23, 2003, counsel for Defendant filed a copy of the Administrative Record in this matter. (Docket Entry Nos. 4, 5).

Plaintiff thereafter filed a Motion to Compel Production of the Administrative Record (Docket Entry No. 19), asserting that portions of the Administrative Record were not submitted by Defendant, and a Motion to Conduct Discovery (Docket Entry No. 20). On April 2, 2004, the Court denied Plaintiff's Motion to Conduct Discovery. (Docket Entry No. 27). On April 15, 2004, the Magistrate Judge held a hearing on Plaintiff's Motion to Compel Production of the Administrative Record. (Docket Entry No. 32). One week later, the Magistrate Judge denied Plaintiff's Motion, determining that the Defendant had submitted the Administrative Record as it existed when Defendant made its final decision to deny Plaintiff's claim for benefits. (Docket Entry No. 34).

Plaintiff then filed a Motion to Remand this case to the Plan Administrator "with instructions to Defendant to include the medical records in Plaintiff's Medical Exhibits in Support of his Motion to Remand and any other and additional evidence that might be necessary or relevant to determine the merits of his claim in the Administrative Record of this claim." (Docket Entry No. 54). Plaintiff contended that remand was necessary because: (1) Defendant failed to include a copy of the summary plan description

2

("SPD") with the Administrative Record, thus Defendant could not establish that its claims review procedure was reasonable; (2) Defendant failed to follow its claims review procedure; (3) Defendant used the wrong benefits expiration date in denying Plaintiff's claim; and (4) Defendant failed to request or consider relevant medical records. The Court denied Plaintiff's Motion, finding that Defendant had substantially complied with ERISA's procedural requirements. (Docket Entry Nos. 79 and 80).

Both parties have filed cross-motions for judgment on the Administrative Record. (Docket Entry Nos. 62 and 82). In addition, Defendant has filed a Motion to Strike (Docket Entry No. 87) and Plaintiff has filed a Second Motion for Discovery (Docket Entry No. 91).

## II. FINDINGS OF FACT

The Administrative Record[2] ("AR") reveals the following facts: Plaintiff George Likas formerly worked for ABM Industries ("ABM") at its Nashville, Tennessee, facility. (AR 0009-0032). Through his employment, Plaintiff received coverage under a group long-term disability policy, policy number LK-030-095 ("the Policy"), issued by Defendant LINA. (Id.) Defendant also serves as the Plan Administrator of the disability plan. (Id.)

The Policy defines "Disability" for employees in Plaintiff's category as follows:

_____

[2]The Administrative Record in the present case consists of 665 pages. (Attach. to Docket Entry No. 4).

3

**Definition of Disability**

An Employee is Disabled if, because of Injury or Sickness,

1. he or she is unable to perform all the material duties of his or her regular occupation, or solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings; and

2. after Disability Benefits have been payable for 24 months he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings.

(AR 0014). The Policy provides that the "Benefit Waiting Period" is 90 days. (Id.) The Policy states that "[t]he Benefit Waiting Period is the period of time an Employee must be continuously Disabled before Disability Benefits may be payable. . . ." (AR 0019). The Policy further provides:

**Disability Benefits**

[Defendant] will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy. The Employee must satisfy the Benefit Waiting Period and be under the care of a Physician. He or she must provide to [Defendant], at his or her own expense, satisfactory proof of Disability before benefits will be paid.

[Defendant] will require continued proof of the Employee's Disability for benefits to continue.
. . . .

**Termination of Disability Benefits**

Disability Benefits will end on the earliest of the following dates.
. . . .
2. The date [Defendant] determines an Employee is not Disabled.
. . . .

(Id.)

Plaintiff first notified Defendant of his claim for disability benefits by telephone on January 4, 2000. (AR 0118). On January 10, 2000, Plaintiff submitted a Disability Proof of Loss form in which he described his condition as "[d]eterioration of muscles and bones throughout entire body" and "pain, weakness, fatigue-muscle and otherwise." (AR 0641). Plaintiff indicated that he was first unable to work on November 30, 1999, (id.), and that in his position at ABM as "Branch Manager" he handled maintenance, sales, and all administrative duties of the company (AR 0642). Plaintiff listed Dr. Kenneth Sharlin, a neurologist, and Dr. David Knapp, a rheumatologist, as physicians who were treating him for his condition. (Id.)

Plaintiff also submitted a leave of absence letter dated December 16, 1999, from Dr. Sharlin, in which Dr. Sharlin noted that Plaintiff suffered from a complex set of symptoms including muscle and joint pain and fatigability. (AR 0640). Dr. Sharlin concluded that although the "precise cause of [Plaintiff's] medical problem [was] not clear at [that] time," Plaintiff was "unable to fulfill the physical requirements of his job." (Id.)

On January 11, 2000, Defendant notified Plaintiff by letter that his claim for short-term disability ("STD") benefits had been approved and would be payable for a maximum of 90 days as long as he remained totally disabled from his regular occupation. (AR 0644). The approval letter also advised Plaintiff that Defendant had contacted his physicians for additional medical information. (Id.)

5

On January 17, 2000, ABM forwarded a letter to Defendant dated January 16, 2000, from Dr. Sharlin, in which Dr. Sharlin noted that he had been treating Plaintiff "for what appear[ed] to be a myofascial pain syndrome." (AR 0638). Dr. Sharlin advised that he had not identified any objective neurological findings since Plaintiff's prior cervical radiculopathy surgery performed by Dr. Timothy Schoettle. (Id.)

On March 1, 2000, Defendant advised Plaintiff that his STD benefits had been issued through February 29, 2000, and that his file had been forwarded to the long-term disability ("LTD") case manager. (AR 0114). That same day, the LTD case manager advised Plaintiff that Defendant was evaluating Plaintiff's claim for LTD disability benefits, that Defendant had requested information from Plaintiff's physicians, and that Defendant needed information from Plaintiff and his employer. (AR 0626). The case manager also advised Plaintiff of the LTD claims process. (AR 0625).

On March 13, 2000, Plaintiff faxed a completed Disability Questionnaire to Defendant. (AR 0613). In the Disability Questionnaire, Plaintiff again identified his doctors as Sharlin and Knapp. (AR 0613).

On March 22, 2000, the LTD case manager received a letter from Dr. Sharlin, who noted that he had difficulty answering Defendant's questions because he did "not know what [was] wrong with Mr. Likas except to say that he appear[ed] to have a myofascial pain syndrome that [was] exacerbated by physical activity." (AR 0611).

6

Dr. Sharlin stated that a recent muscle biopsy performed on Plaintiff had been normal. (Id.)

On March 30, 2000, the LTD case manager informed Plaintiff that Drs. Sharlin and Knapp had not responded to his request for information. He advised Plaintiff to contact both physicians and urge them to provide the information. (AR 0598-0600).

On April 3, 2000, Defendant advised Plaintiff by letter that it had approved Plaintiff's long-term disability claim. (AR 0593-0594). Defendant advised him that "payment of future benefits [would] depend on certification of [Plaintiff's] continuing disability." (AR 0593).

On June 20, 2000, an occupational consultant at LINA advised Plaintiff by telephone that Defendant needed updated medical information from his doctor regarding his status. (AR 0587).

Six days later, Dr. Sharlin opined in a letter that Plaintiff was finding relief with his medical regimen and that he felt that Plaintiff could try to return to work on a part-time basis on July 17, 2000. He stated that he or Plaintiff's primary care physician would review Plaintiff's condition in thirty days to determine his ability to return to full-time work. (AR 0585). Plaintiff advised Defendant by telephone on July 10, 2000, that he hoped to return to work soon. (AR 0582).

Plaintiff returned to work part-time during July 2000, but in mid-August 2000 he missed work for a week due to extreme pain in his neck, arms, and legs. (AR 0576). On August 18, 2000, Dr. Brett Darwin submitted a note stating that Plaintiff would need

"to be totally off work again indefinitely" and would need regular re-evaluations to determine his ability to return to work. (AR 0579). On January 31, 2001, Defendant notified Plaintiff by letter that the policy required continued proof of disability for benefits to continue and enclosed a Supplementary Claim form to be completed by Plaintiff and his attending physician. (AR 0574-0575). The letter also indicated that Plaintiff should contact his medical providers and urge them to respond as soon as possible. (Id.)

Defendant received the completed Supplemental Claim form, dated February 13, 2001. (AR 0572-0573). Dr. Matthew J. Beuter, an internist and Plaintiff's primary care physician, completed the Attending Physician's Statement, listing Plaintiff's condition as "lumbar spine arthritis/chronic pain syndrome" and stating that Plaintiff had "improved." (Id.) Dr. Beuter also indicated that he did not "do disability evaluations based on [the] federal dictionary [of occupational titles]," and that Plaintiff was "unable to work." (Id.)

On March 1, 2001, Defendant requested that ABM complete a Job Requirements form. (AR 0568-0571). ABM responded, confirming that Plaintiff was the Branch Manager of the Nashville Landscape office and was responsible for all daily office functions including administration, production, and sales. (AR 0548-0550). ABM noted that Plaintiff's job did not require lifting, carrying, pushing, pulling, balancing, stooping, kneeling, crouching, or crawling, but that it did require sitting frequently, standing, and occasional walking and climbing. (Id.)

Defendant also requested that Plaintiff's former primary care physician, Dr. Darwin, as well as Dr. Beuter respond to specific questions and provide copies of their office notes. (AR 0547, 0563). On March 16, 2001, Defendant requested medical information and records from Dr. Timothy Schoettle, who had performed cervical radiculopathy surgery on Plaintiff. (AR 0556, 0638).

On April 16, 2001, and June 11, 2001, Defendant advised Plaintiff that Drs. Bueter and Schoettle had not responded to its requests for additional medical information. (AR 0555, 0529). Defendant informed Plaintiff that the information requested was essential in establishing proof of disability and requested that Plaintiff urge his doctors to respond as soon as possible. (Id.)

On June 11, 2001, Defendant sent a written request for medical information to one of Plaintiff's physicians, Dr. Tarek G. Elalayli, a specialist in spine trauma, reconstruction neck and low back disorders in the Department of Orthopedics and Rehabilitation at Vanderbilt University School of Medicine. (AR 0498, 0541).

On June 13, 2001, Defendant received medical information from Dr. Beuter. (AR 0537). Dr. Beuter stated that Plaintiff was not able to return to work at that time because he had "chronic pain syndrome," and that Plaintiff had been referred to the Vanderbilt Spine and Rehabilitation Clinic. (Id.) Dr. Beuter's medical records reveal that when he saw Plaintiff on December 26, 2000, Plaintiff brought a "large supply of outside medical records" and Plaintiff left them with Dr. Beuter, which he reviewed. (AR 0533).

9

On July 27, 2001, and August 27, 2001, Defendant advised Plaintiff that Drs. Elalayli and Schoettle had not responded to its requests for additional medical information. (AR 0515, 0520). Defendant informed Plaintiff that the information requested was essential in establishing proof of disability and requested that Plaintiff urge his doctors to respond as soon as possible. (Id.)

By letter dated August 21, 2001, Dr. Elalayli responded to Defendant's request for information, in which he stated that he did "not see any physical limitation keeping [Plaintiff] from work; however, [Plaintiff] does have subjective complaints of pain and restrictive motion and weakness which [Plaintiff] says prevent [Plaintiff] from work." (AR 0498-0499). Dr. Elalayli further explained that the records he had reviewed, including an MRI and EMG, did not reflect any physical reason for Plaintiff's symptoms. (Id.) Dr. Elalayli also submitted the Electromyographic Report ("EMG") dated July 17, 2001, which although revealing C8-T1 radiculopathy, revealed "no electrical evidence of either a bilateral carpal tunnel or a bilateral lumbosacral radiculopathy." (AR 0502-0504).

On August 30, 2001, Defendant requested Plaintiff's medical records from Vanderbilt University Medical Department. (AR 0513). Defendant also sent a letter to Plaintiff, advising him that after twenty-four months of LTD benefits, he must prove he is totally disabled from performing the essential duties of any occupation for which he was or might reasonably become qualified by education, training or experience. (AR 0509). Defendant also advised

10

Plaintiff that if he had changed physicians within the last six months he must provide Defendant with contact information for his current physicians. (Id.)

On September 5, 2001, Defendant received additional office notes from Dr. Elalayli, which included a May 16, 2001, letter from Dr. Elalayli to Dr. Beuter, wherein he noted that although an MRI of Plaintiff's cervical spine revealed some disc material prominent at C5-6 on the left side, it did not appear to be causing any severe canal compromise and that a lumbar MRI was normal. (AR 0482-0484). In a telephone conversation on September 24, 2001, Defendant advised Plaintiff's wife that Dr. Elalayli had opined that he saw no physical limitation to preclude Plaintiff from work and that Defendant needed medical information to support Plaintiff's claim of total disability. (AR 0475). Plaintiff's wife advised Defendant that Plaintiff had also been treated by Dr. Refaat El-Said, a neurologist at Vanderbilt University Medical Center. (Id.) Defendant then requested medical information from Dr. El-Said. (AR 0481).

On October 11, 2001, Defendant advised Plaintiff that Dr. El-Said had not responded to its request for medical information and that if the information was not received by October 31, 2001, Defendant would make a determination based on the information contained in the file at that time. (AR 0459). Defendant also advised Plaintiff to contact his physicians and urge them to submit information as soon as possible. (Id.)

11

On October 22, 2001, Defendant's vocational rehabilitation counselor performed a vocational review of Plaintiff's file and determined, based on the information in the file, including the Job Requirements provided by ABM, that Plaintiff's occupation, according to the Dictionary of Occupational Titles ("D.O.T."), was classified as sedentary. (AR 0458).

On October 23, 2001, Defendant received a response to its request for information from Dr. Schoettle, including a completed Physical Ability Assessment ("PAA") and office notes. (AR 0461-0474). In the PAA, dated October 11, 2001, Dr. Schoettle stated that Plaintiff could lift 10 pounds occasionally, carry up to 20 pounds occasionally, sit frequently, stand frequently, walk occasionally, push and pull 20 pounds occasionally, climb frequently, balance, crawl, crouch, stoop, and kneel occasionally, reach overhead occasionally, reach at desk level, and reach below waist frequently. (AR 0463-0464). In response to one of Defendant's questions, Dr. Schoettle stated that it was "undetermined" whether Plaintiff could return to work. (AR 0462).

On October 30, 2001, Defendant received the PAA form from Dr. El-Said, in which he stated that he had found "no neurologic cause for [Plaintiff's] symptoms" and that "Plaintiff has chronic pain syndrome." (AR 0452-0456).

On November 5, 2001, Defendant advised Plaintiff by letter that it was denying his claim for continued LTD benefits. (AR 0446-0448). Defendant explained that it had reviewed information from Drs. Elalayli, Schoettle, Beuter, and El-Said before making its determination. (Id.) Defendant advised Plaintiff that it had

determined Plaintiff could perform his occupation and, thus, no longer satisfied the Policy definition of "Disability." Defendant's letter informed Plaintiff of his right to appeal the decision, provided a list of specific information which he should submit to support his appeal, and advised that Defendant would review any evidence he wished to submit. (<u>Id.</u>)

Plaintiff's appeal letter, dated January 2, 2002, was received by Defendant on January 7, 2002. (AR 0421-0441). In his appeal letter, Plaintiff (1) stated he was unable to work in any occupation, even a sedentary job, because his "pain is disabling physically and mentally"; (2) informed Defendant that he was no longer a patient of Dr. Schoettle and would be seeing another neurosurgeon in March; (3) disputed ABM's job description, asserting that he spent a lot of time walking around job sites; and (4) advised that he was including letters from his current doctors and an updated copy of his medical records. (AR 0421).

In addition to several medical records already submitted to Defendant, the following were attached to Plaintiff's appeal letter: (1) December 6, 2001, letter from Dr. Benjamin W. Johnson, Director of Vanderbilt Pain Control Center, indicating that Plaintiff had been diagnosed and treated for cervical post-laminectomy pain syndrome, cervical radiculopathy, and reactive depression and that the current clinical opinion suggests that Plaintiff was not currently able to perform his job description and that Plaintiff may anticipate returning to work in eight months (AR 0422); (2) December 1, 2001, Office Note of Dr. Johnson (AR 0423);

13

(3) December 19, 2001 Office Note of Dr. Johnson (AR 0424);
(4) October 22, 2001, Office Note of Dr. Johnson (AR 0425-0426);
(5) November 26, 2001, letter from Dr. El-Said to Dr. Beuter
(AR 0427); (6) September 10, 2001, Office Note of Dr. El-Said
(AR 0428-0429); (7) September 19, 2001, cervical spine MRI (AR
0429); (8) September 20, 2001 letter from Dr. El-Said to Dr. Beuter
(AR 430); (9) July 10, 2001, Office Note of Dr. Elalayli (AR 0432);
(10) May 16, 2001 x-ray of Plaintiff's pelvis (AR 0437); (11)
May 16, 2001, x-ray of Plaintiff's cervical spine and thoracic
spine (AR 0437-0438); and (12) February 24, 2000, Muscle Biopsy
(AR 0440-0441).

On January 15, 2002, Defendant received a letter from
Dr. Stephen C. Humble, in which Dr. Humble stated that he had been
treating Plaintiff for Major Depressive Disorder with Anxiety
secondary to a severe degenerative disc disorder and associated
pain. Dr. Humble did not submit any medical records to Defendant,
but stated that Defendant should contact him if Defendant required
any additional information. (AR 0419).

On January 19, 2002, Defendant sent Plaintiff a letter
advising him that his appeal had been received and that Plaintiff
had 45 days to supply any relevant information for Defendant to
consider and that Defendant would make its decision within 30 days
of receipt of any additional information. (AR 0416-0417).

On February 6, 2002, Plaintiff advised Defendant by letter
that he was being considered for surgery by neurosurgeon Dr. Paul
Boone. (AR 0409). On February 20, 2002, Plaintiff sent a letter

14

to Defendant advising that a date had been set for surgery and that he had also seen Dr. George Allen at Vanderbilt Neurosurgery. (AR 0407). On March 2, 2002, Plaintiff submitted a letter dated January 30, 2002, from Dr. Allen to Dr. Johnson concerning the possibility of further surgery. (AR 0405).

On March 21, 2002, Plaintiff spoke to a representative of Defendant by telephone and informed Defendant that he was claiming psychiatric disability. (AR 0392). Defendant advised Plaintiff that it would need medical records related to his psychiatric condition, as well as records from Dr. Boone. (Id.) Defendant also explained that it needed medical information supporting Plaintiff's continuous disability from October 2001 to present. (Id.)

On March 22, 2002, Defendant requested medical information on Plaintiff from Drs. Allen and Humble. (AR 0388-89, 0391). On March 26, 2002, Plaintiff submitted additional medical information, including Dr. Boone's office notes and two MRIs of Plaintiff's cervical spine which previously had been submitted to Defendant. (AR 0367-0370, 0376-0377).

In a letter dated April 1, 2002, Plaintiff stated that Dr. Humble had already written a letter dated January 15, 2002, documenting his treatment and enclosed a copy of Dr. Humble's letter. (AR 0348-0349). On April 4, 2002, Plaintiff submitted the March 22, 2002, Operative Report from his most recent surgery and a March 25, 1999, MRI of his cervical spine. (AR 0339-0343).

15

By letter dated May 1, 2002, Defendant advised Plaintiff that it had determined that it was necessary to forward Plaintiff's file for peer review by a neurosurgeon. (AR 0328). Dr. Scott G. Cutler, Diplomate of the Board of Neurological Surgery, reviewed the medical records in Plaintiff's file and concluded that there was no medical documentation to support Plaintiff's inability to work light duty positions after October 28, 2001, and that there was no demonstrated condition that would preclude Plaintiff from working full-time in a sedentary position as of October 28, 2001. (AR 0324-0325).

On May 30, 2002, Dr. Johnson submitted another letter to Defendant, stating that Plaintiff could not "currently perform his job description," and that he may anticipate returning to work in approximately eight months. (AR 0322).

On June 19, 2002, Defendant advised Plaintiff that after reviewing his appeal, it was upholding its previous decision to terminate Plaintiff's LTD benefits. (AR 0311-0312).

### III. CONCLUSIONS OF LAW

Before turning to the parties' cross-motions for judgment on the Administrative Record, the Court will address the other pending motions filed by the parties.

**A.** **Defendant's Motion to Strike or Exclude**

Defendant asks the Court to strike or exclude from consideration the attachment to Plaintiff's memorandum filed in support of his motion for judgment on the Administrative Record entitled "Plaintiff's Citation to Medical Authorities" and all

16

references to the attachment in Plaintiff's memorandum. (Docket Entry No. 87). Defendant contends that well-established precedent prohibits the Court from considering evidence outside of the Administrative Record in the course of reviewing Defendant's claims decision. Plaintiff counters that the Court is required to consider the evidence because it supports his procedural challenge to Defendant's decision to terminate benefits.

"[I]n reviewing ERISA benefit denial cases, a district court only considers the administrative record that was before the administrator at the time the claim for benefits was denied." Perry v. Simplicity Eng'g. Inc., 900 F.2d 963, 966 (1990). However, "[t]he District Court may hear evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part." Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 619 (6th Cir. 1998)(Gilman, J., concurring).

Here, Plaintiff asserts that because the Administrative Record contains no information on the nature, severity, and symptoms of a condition for which he seeks disability benefits, Defendant did not afford Plaintiff due process in the administration of his claim for disability benefits. Plaintiff's submission of medical authorities consists of information he claims ought to have been considered by

17

Defendant.[3]  However, as the Court has ruled previously (see Docket
Entry No. 80), under the policy governing Plaintiff's claim,
Defendant did not have a duty to request and obtain every medical
record generated in the course of Plaintiff's treatment.  Nor does
the Court read the policy to require Defendant to seek out
information about a claimant's condition or conditions beyond that
provided by Plaintiff's physicians or by independent medical
examiners hired by Defendant.  The policy clearly states that it is
Plaintiff's responsibility under the policy to prove his continuing
disability.

The Administrative Record shows that Defendant considered all
of the information submitted by Plaintiff in support of his claim
and even specifically requested, sometimes on multiple occasions,
particular medical records and information which Defendant believed
would be useful in evaluating Plaintiff's claim.  If the
Administrative Record is lacking information which Plaintiff
believes is pertinent to his claim, he bears the responsibility for
the absence of that information.  Plaintiff had many opportunities
to submit any evidence he wished to support his claim.  He cannot
now attempt to submit new medical evidence for the first time at
this late stage of the proceedings.  Allowing Plaintiff to do so

---

[3]Plaintiff alternatively alleges that Defendant may have
considered such information but purposefully excluded it from the
Administrative Record.  (Docket Entry No. 89 at 2).  There is no
evidence in the record to support such an allegation.

18

would be prejudicial to Defendant and would go against well-settled ERISA law. Accordingly, Plaintiff's Motion shall be DENIED.

**B.** **Plaintiff's Second Motion to Conduct Discovery**

Plaintiff seeks permission to conduct discovery related to a potential conflict of interest arising from what Plaintiff describes as a newly-discovered or newly-realized relationship between Intracorp and Defendant LINA.[4] (Docket Entry No. 91). Defendant objects, claiming that Plaintiff has had access to information about the relationship between the two entities since June 2003, and, in any event, Plaintiff's motion to conduct discovery is untimely. (Docket Entry No. 93).

As Defendant points out, the deadline for seeking discovery in this case has long since passed. (Docket Entry No. 18). Any motion for discovery on behalf of Plaintiff was to be filed by February 21, 2004. (Id.) Plaintiff did not request an extension of that deadline, and his second motion for discovery was filed over a year after the deadline, on October 19, 2005. (Docket Entry No. 91).

The relationship between Intracorp and LINA was disclosed in the Administrative Record filed with the Court on June 2, 2003. Thus, Plaintiff has had access to this information for some time and has not justified the untimeliness of his request to conduct discovery related to that relationship and possible conflict of

_____

[4]LINA hired Intracorp to locate and engage an independent neurosurgeon, Dr. Scott G. Cutler, M.D., to review Plaintiff's file. (AR 0323-0328).

19

interest.  In addition, the Court has previously denied Plaintiff's request to conduct discovery in this matter due to a conflict of interest.  (Docket Entry No. 27).   The Court will consider any conflict or conflicts of interest when evaluating Defendant's decision to terminate benefits.  Consequently, Plaintiff's Second Motion to Conduct Discovery (Docket Entry No. 91) shall be DENIED.

**C.   Cross-Motions for Judgment on the Administrative Record**

**1.   Standard of Review**

The  Supreme  Court  instructs  that  a  denial  of  benefits challenged under ERISA "is to be reviewed under a de novo standard unless  the  benefit  plan  gives  the  administrator  or  fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Firestone Tire & Rubber Co. v. Bruch, 489  U.S.  101,  115  (1989).   The  language  of  the  plan determines  whether  the  court  must  apply  the  arbitrary  and capricious standard of review or whether the court must review the determination de novo.  If the language of the plan gives the plan administrator discretionary authority to determine eligibility for benefits  or  to  construe  plan  terms,  the  highly  deferential arbitrary and capricious standard applies.  Id.

"While 'magic words' are unnecessary to vest discretion in the plan  administrator  and  trigger  the  arbitrary  and  capricious standard of review, this circuit has consistently required that a plan contain 'a clear grant of discretion [to the administrator] to determine benefits or interpret the plan.'"  Perez v. Aetna Life Ins. Co., 150 F.3d 550, 555 (6th Cir. 1998)(en banc)(quoting Wulf

20

v. Quantum Chem. Corp., 26 F.3d 1368, 1373 (6th Cir. 1994)(emphasis in original)).

Here, the relevant plan language provides that:

> [The employee] must provide to the Insurance Company, at his or her own expense, **satisfactory proof** of Disability before benefits will be paid.

(AR 0019)(emphasis added). Courts have held that plan language such as this requiring that "satisfactory" proof or evidence be provided to the insurer is sufficiently clear to vest the insurer with discretion, and therefore the insurer's decision is to be reviewed under the arbitrary and capricious standard of review. See, e.g., Perez, 150 F.3d at 555-57; Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 380-81 (6th Cir. 1996)(applying arbitrary and capricious standard of review where plan provided that claimant must submit "satisfactory proof of Total Disability" to insurer); Miller v. Metro. Life Ins. Co., 925 F.2d 979, 983 (6th Cir. 1991)(applying arbitrary and capricious standard of review where plan provided that disability would be determined "on the basis of medical evidence satisfactory to the Insurance Company.").

Here, Plaintiff and Defendant agree that the correct standard of review is the arbitrary and capricious standard of review. (Docket Entry Nos. 64 at 32 and 83 at 9). In applying that standard, the Court asks whether the denial or termination of benefits was "rational in light of the plan's provisions." Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1998) "In other words: When it is possible to offer a reasoned explanation, based on the

21

evidence, for a particular outcome, that outcome is not arbitrary or capricious." <u>Smith v. Ameritech</u>, 129 F.3d 857, 863-64 (6th Cir. 1997)(citing <u>Davis v. Ky. Fin. Cos. Retirement Plan</u>, 887 F.2d 698, 693 (6th Cir. 1989) (internal quotations omitted)).

"The arbitrary and capricious standard is the least demanding form of judicial review." <u>Hunter v. Caliber Sys., Inc.</u>, 220 F.3d 702, 709-10 (6th Cir. 2000). However, the Sixth Circuit has made clear that the arbitrary and capricious standard of review is not a mere formality:

> [M]erely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions. As we observed recently, "[t]he arbitrary-and-capricious . . . standard does not require us to merely rubber stamp the administrator's decision." <u>Jones v. Metropolitan Life Ins. Co.</u>, 385 F.3d 654, 661 (6th Cir. 2004). Indeed, "[d]eferential review is not no review, and deference need not be abject." <u>McDonald</u>, 347 F.3d at 172. Our task at all events is to "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." <u>Id.</u>

<u>Moon v. Unum Provident Corp.</u>, 405 F.3d 373, 379 (6th Cir. 2005).

In conducting an arbitrary and capricious review of the administrative record, only the facts known to the administrator or fiduciary at the time it made the decision are considered. <u>Id.</u> at 378-79. Thus, the Court's review is confined to the Administrative Record as it existed on June 19, 2002, when LINA issued its final decision upholding the termination of plaintiff LTD benefits.

22

**2. Conflict of Interest**

The parties agree that conflicts of interest exist in this case. However, the existence of a conflict of interest does not change the standard of review under which the court evaluates plaintiff's claim. Davis v. Ky. Fin. Cos. Retirement Plan, 887 F.2d 689, 694 (6th Cir. 1989); see also Firestone, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187, Comment d (1959)); see also Univ. Hospitals, 202 F.3d at 847. It is merely a factor for the court to consider in determining whether there has been an abuse of discretion. Id. In other words, "the abuse of discretion or arbitrary and capricious standard still applies, but application of the standard should be shaped by the circumstances of the inherent conflict of interest." Borda v. Hardy, Lewis, Pollard & Page, P.C., 138 F.3d 1062, 1069 (6th Cir. 1998).

**3. Analysis**

Having established the appropriate standard of review, and keeping in mind the existence of conflicts of interest, the Court must now determine whether LINA's decision to terminate Plaintiff's LTD benefits was "rational in light of the plan's provisions." Daniel, 839 F.2d at 267. Plaintiff urges that LINA's decision to terminate his LTD benefits was arbitrary and capricious because the explanations provided by LINA are contradicted by the Administrative Record or are "demonstrably not true." (Docket Entry No. 83 at 10). Defendant denies these contentions and maintains that its decision to deny benefits is supported by the Administrative Record.

23

Having carefully reviewed the Administrative Record and the parties' briefs submitted in support of their cross-motions for judgment on the Administrative Record, and considering the conflicts of interest present in this case, the Court finds that LINA's decision to terminate LTD benefits to Plaintiff was not arbitrary and capricious. That is to say, the record supports a reasoned explanation for LINA's decision. Specifically, the following evidence contained in the Administrative Record indicates that as of October 2001, Plaintiff was capable of fulfilling the duties of his sedentary job: Plaintiff's own treating physicians Drs. Schoettle and Elalayli opined that Plaintiff could perform sedentary work; an independent peer review physician found on review during the appeal of Plaintiff's claim that Plaintiff could perform sedentary work; and Plaintiff's clinical and diagnostic tests were normal.

Dr. Timothy Schoettle, who had performed surgery on Plaintiff, stated that he could lift 10 pounds occasionally, carry up to 20 pounds occasionally, sit frequently, stand frequently, walk occasionally, push and pull 20 pounds occasionally, climb frequently, balance, crawl, crouch, stoop, and kneel occasionally, reach overhead occasionally, reach at desk level, and reach below waist frequently. (AR 0462-0464). Dr. Schoettle's office notes stated that Plaintiff's diagnostic testing had been overwhelmingly normal, that he did not see any significant abnormality, and that he could not find anything to explain Plaintiff's symptoms. (AR 0473-0467).

24

Plaintiff makes much of the fact that Dr. Schoettle had not seen Plaintiff in more than ten months when he completed LINA's questionnaire on October 11, 2001. However, LINA sent the form to Dr. Schoettle in March 2001. Any delay in receiving Dr. Schoettle's opinion is not attributable to LINA, as LINA advised Plaintiff on four separate occasions that Dr. Schoettle had not responded, emphasized the importance of Dr. Schoettle's response, and encouraged Plaintiff to facilitate Dr. Schoettle's response. Under the policy, it is Plaintiff's responsibility to provide LINA with satisfactory proof of his continued disability. Moreover, if Plaintiff felt that another physician might have been better equipped to opine on Plaintiff's condition for whatever reason, it was Plaintiff's responsibility to bring that physician to LINA's attention.

Plaintiff also emphasizes that on Defendant's questionnaire, Dr. Schoettle wrote it was "undetermined" whether Plaintiff could return to work. (AR 0462). However, Defendant could have reasonably concluded that Dr. Schoettle's uncertainty in answering that question was the result of Dr. Schoettle not knowing the details of Plaintiff's job. Significantly, Dr. Schoettle was quite clear in his medical opinion that Plaintiff could perform a myriad of tasks such as lifting, walking, pushing, pulling, climbing, crawling, crouching, and stooping--all tasks consistent with the duties of a sedentary job. (AR 0462-0464).

25

Another of Plaintiff's doctors, Dr. Elalayli,[5] opined in his
August 21, 2001, letter to LINA that, although Plaintiff had
subjective complaints of severe pain that Plaintiff said prevented
him from working, Dr. Elalayli did "not see any physical limitation
keeping him from work."  (AR 0498-0499).

Dr. Cutler, the peer review physician hired by Defendant,
concluded in his May 8, 2002, report that there was no medical
documentation to support any condition that would preclude
Plaintiff from working full-time in a sedentary position as of
October 2001.  (AR 0325-0324).  Plaintiff attempts to discount Dr.
Cutler's opinion, claiming that LINA did not provide Dr. Cutler
with Plaintiff's complete medical records to review, thus, Dr.
Cutler's opinion is  based on incomplete information. However, a
closer reading of Plaintiff's argument reveals that Plaintiff
complains that LINA did not provide Dr. Cutler with medical records
and reports pertaining to Plaintiff's condition and treatment after
October 2001.

Indeed, throughout his motion for judgment on the
Administrative Record and his response to LINA's cross-motion,
Plaintiff faults LINA for not considering or inadequately
considering medical tests and reports for treatment that took place
subsequent to October 2001 and for not considering or inadequately
considering physician opinions regarding treatment Plaintiff

---

[5]Dr. Elalayli is a spine trauma, reconstruction, neck and low
back disorders doctor at Vanderbilt University Department of
Orthopaedics and Rehabilitation.

26

received after October 2001.[6]  The Administrative Record shows that

LINA considered information submitted by Plaintiff after October

2001, as long as it pertained to Plaintiff's condition through that

date.[7]  Plaintiff's continued attempts to introduce medical records

and opinions pertaining to his condition in 2002 are not helpful to

the Court in determining whether Plaintiff was disabled as of

October 2001.

While there is evidence in the Administrative Record

supporting Plaintiff's claimed disability, the Court cannot say it

was unreasonable for LINA to give more credence to the opinions of

Drs. Elalayli, Schoettle, and Cutler over the conflicting opinions

of Drs. Beuter, Darwin, and Johnson.  Although Dr. Beuter,

Plaintiff's primary care physician, opined in late 2000 and 2001

that Plaintiff was "unable to work" because of numerous

limitations, he refused to complete the disability evaluation

_____

[6]For example, Plaintiff complains that LINA did not take into
account that on January 15, 2002, Plaintiff's treating psychiatrist
opined that Plaintiff was disabled due to a major depressive
disorder with anxiety secondary to a severe degenerative disc
disorder and associated pain.  (AR 0419).  Or that Plaintiff
underwent another surgery on March 22, 2002.  (AR 340-342).

[7]The reason Defendant limited its review to evidence
pertaining to Plaintiff's condition and treatment through October
2001 is because that is when Defendant determined that Plaintiff no
longer satisfied the policy's definition of disability.  The Policy
requires that Plaintiff must provide "continued proof" of his
disability for benefits to continue.  (AR 0019).  Further,
disability benefits end on "[t]he date [LINA] determines an
Employee is not Disabled. . . ."  (AR 0019).  Once Plaintiff's
disability ended, he no longer had insurance under the policy.
Thus, any subsequent deterioration of his condition would not be
covered under the policy.

27

section of LINA's form, which would have given LINA more information regarding Plaintiff's claimed limitations. (AR 0572-0573). Dr. Darwin, another of Plaintiff's physicians, stated (without further explanation) in August 2000 that Plaintiff "has had increasing pain" and would need to be "off work again indefinitely." (AR 0579). Although LINA requested Dr. Darwin's medical records and information, Dr. Darwin never submitted any medical records or information. (AR 0563).

On appeal, Plaintiff submitted two letters from Dr. Johnson to CIGNA, dated December 6, 2001, and May 30, 2002, in which Dr. Johnson wrote that his "clinical opinion suggests that [Likas] cannot currently perform his job description; and that he may anticipate returning to work in approximately eight months." (AR 0422 and 0322). First, Dr. Johnson never submitted any clinical data or evidence supporting these statements. Second, it was not unreasonable for LINA to question or discount Dr. Johnson's opinion when he submitted his opinion for the first time after Drs. Schoettle and Elalayli had opined that Plaintiff was capable of sedentary work and after LINA had denied Plaintiff continuing LTD benefits. See Gooden v. Provident Life & Accident Ins. Co., 250 F.3d 329, 333-334 (5th Cir. 2001)(finding no abuse of discretion by disability insurer in denying benefits although physician submitted letter stating claimant was disabled after claimant was terminated and without accompanying medical evidence).

Moreover, the Administrative Record contains normal results of Plaintiff's clinical and diagnostic testing which support and

28

confirm what Drs. Elalayli, Schoettle, and Cutler opined: a normal muscle biopsy in spring 2000 (AR 0611); a July 17, 2001, EMG which revealed "no electrical evidence of either a bilateral carpal tunnel or of a bilateral lumbosacral radiculopathy" (AR 0502-0504); an MRI of his cervical spine revealed some disc material prominent at C5-6 on the left side but did not appear to be causing any severe canal compromise (AR 0482-0484); the cervical myelogram was a normal post-operative study (AR 0473); the lumbar and thoracic myelograms were normal (Id.); the myelographic studies of Plaintiff's whole spinal axis revealed some post-operational changes and very mild central disc bulging that was not causing central stenosis or spinal nerve root impingement (AR 0472); a January 24, 2001, MRI showed "a lot of arthritis, [but] no cord compression or surgical lesion" (AR 0467-0469); and a January 2001 examination by Dr. Schoettle of Plaintiff's upper and lower extremities revealed normal motor function (AR 0470-0471).

Since it is possible to offer a reasoned explanation, based on the evidence, for Defendant's decision to deny Plaintiff's claim for long term disability benefits, the Court finds that Defendant's decision was not arbitrary and capricious.

The Court notes that LINA's letter upholding its previous denial of the termination of Plaintiff's benefits suggests that Plaintiff's impairment must be caused by or linked to his known neurological conditions.[8]    Plaintiff is correct that the Policy

_____

[8]The letter states: "As you are aware, your claim was denied beyond October 27, 2001 when your Attending Physician provided

does not require that he prove that his symptoms are accounted for by a known and diagnosed medical condition. If LINA had conditioned Plaintiff's receipt of LTD benefits on such a requirement, the Court's analysis and decision herein might very well be different. LINA is not permitted, of course, to add a new requirement for benefits that is not in the policy. All that is required to qualify for benefits is for a claimant to be unable to perform all the material duties of his or her regular occupation due to sickness or injury. (AR 0014). Because Defendant determined that Plaintiff could perform the duties of his sedentary occupation based on the opinions of two of Plaintiff's treating physicians, the opinion of an independent medical examiner, and on Plaintiff's normal test results, Defendant's conclusion that Plaintiff no longer met the Policy's definition of disabled was not arbitrary and capricious.

## IV.  CONCLUSION

For the reasons explained herein, (1) Defendant's Motion for Judgment on the Administrative Record (Docket Entry No. 62) shall be GRANTED; (2) Plaintiff's Motion for Judgment on the Administrative Record (Docket Entry No. 82) shall be DENIED; (3) Defendant's Motion to Strike, or in the Alternative to Exclude from

---

limitations and restrictions that would have allowed you to return to work in your sedentary occupation. After this time, you continued to have complaints of pain of essentially your whole body. Based on the description and follow up radiographic analysis, the Peer Review indicated there is no known neurological entity that would account for this plethora of complaints." (AR 0311).

Consideration, Plaintiff's Citations to Medical Authorities (Docket Entry No. 87) shall be GRANTED, and these filings were not considered by the Court; and (4) Plaintiff's Second Motion for Discovery (Docket Entry No. 91) shall be DENIED.

An appropriate Order shall be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE